UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ROBERT M. DOMINICK, SR.,

                        Plaintiff,                 **OPINION & ORDER**

        - against -                               16-CV-5136 (CS)

NEWBURGH ENLARGED CITY SCHOOL
DISTRICT,

                        Defendant.
-------------------------------------------------------------------x

Appearances:

Jonas Urba
Urba Law PLLC
Tarrytown, New York
*Counsel for Plaintiff*

Stephen Bergstein
Bergstein & Ullrich, LLP
New Paltz, New York
*Counsel for Plaintiff*

Mark C. Rushfield
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, New York
*Counsel for Defendant*

Seibel, J.

      Before the Court is the motion for summary judgment of Defendant Newburgh Enlarged City School District (the "District"). (Doc. 59.)

## I.    **BACKGROUND**

###    A.    **Facts**

      The following facts are taken from the parties' Local Civil Rule 56.1 Statements and supporting materials and are undisputed unless otherwise noted.

Plaintiff Robert M. Dominick was born in September 1954. (Doc. 69 ("P's 56.1 Response") ¶ 1.) In February 1994, the District hired Plaintiff as a senior custodian. (Doc. 67 ("Urba Aff.") Ex. 1 at 33.)[1] In December 2001, Plaintiff was promoted to the position of carpenter. (*Id.* at 72.) In December 2002, at the age of forty-eight, Plaintiff became the Supervisor[2] of Buildings and Grounds, a position he held until June 30, 2015, when his retirement became effective. (*Id.* at 191; Doc. 61 ("Leimer Aff.") ¶ 2.) He was sixty years old when he retired. The position of Supervisor of Buildings and Grounds is considered a "confidential managerial position." (Leimer Aff. ¶ 2; Doc. 64 ("Velez Aff.") ¶ 2.)

The District has call-in taping systems that District employees are required to contact to report absences from work. (P's 56.1 Response ¶ 5.) The parties dispute whether this call-in requirement applied to Plaintiff given his confidential managerial position. Plaintiff argues that he was not subject to the requirement because he was not a civil service employee. (*See id.* ¶ 5.) The District asserts that all of the District's employees were subject to this requirement, except the District's senior staff, and that confidential managerial employees were not exempt. (*Id.*; Leimer Aff. ¶ 3; Velez Aff. ¶ 2.)

During the 2014-15 school year, Plaintiff received several notices that he had failed to call the tape, all of which were approved by the District's Director of Human Resources, Pamela

---

[1] Citations to the exhibits to the Urba Affidavit refer to the document's Bates numbers, not the Court's Electronic Case Filing ("ECF") system pagination, unless otherwise indicated.

[2] On March 26, 2003, the District sent a letter to Plaintiff confirming his appointment to a "Supt. of Building & Grounds position." (Urba Aff. Ex. 1 at 191.) Further, Paragraphs 37 and 44 of Plaintiff's 56.1 Response refers to Plaintiff's position as "Superintendent" instead of "Supervisor." But Plaintiff's papers largely refer to Plaintiff's position as "Supervisor" instead of "Superintendent." Because Plaintiff has not pointed me to a meaningful distinction between the two terms, I assume one does not exist.

Peterson. (P's 56.1 Response ¶¶ 7-11.) These notices are not considered disciplinary in nature. (*Id.* ¶ 12.) Plaintiff received notices that he had failed to call the taping system on or around:

- May 13, 2014, for failing to call in to the taping system for sick days on May 12 and 13, 2014, (Doc. 60 ("Rushfield Affirm.") Ex. D);

- October 3, 2014, for failing to call in to the taping system for a personal day on October 1, 2014; (*id.* Ex. E);

- February 4, 2015, for failing to call in to the taping system for half a sick day on February 3, 2015, (*id.* Ex. F); and

- March 10, 2015, for failing to call in to the taping system for half a sick day on March 9, 2015, (*id.* Ex. G).

Plaintiff alleges he did not get such notices for years before 2014, (Doc. 68 ("P's Opp.") at 2), but he neither claims to have failed to call the tape when required before May 13, 2014, nor denies that he did fail to call on the dates listed above.[3]

On March 25, 2015, Plaintiff was suspended with pay after being accused of breaking into and searching a locked office (actually a closet another employee had set up as an office), (Urba Aff. Ex. 1 at 129; *id.* Ex. 5A at 2),[4] and on March 30, 2015, Mary Ellen Leimer, the District's Assistant Superintendent for Human Resources and the individual Plaintiff regards as the discriminator, lifted the suspension, (Urba Aff. Ex. 3(A) at 129). Her letter to that effect specified that he had not disturbed the contents of the office and could return to work, but referred to Plaintiff's "forced entry." (*Id.*) Plaintiff, by letter dated April 14, 2015, asked that Leimer's letter be amended to indicate that no forced entry had occurred, (Urba Aff. Ex. 18 at 7), but apparently Leimer did not comply with that request.

---

[3] Plaintiff raised no objection upon receiving the notices. (P's 56.1 Response ¶ 14.)

[4] This citation refers to ECF page 2.

3

Between 2008 and 2016, the District needed multiple substantial reductions of its employees to balance its budget. (P's 56.1 Response ¶ 25.) To preserve pedagogical positions, the District had to abolish a substantial number of administrative, clerical, and operational positions and reductions were often made in the Operations and Maintenance Division. (P's 56.1 Response ¶ 26.) On a number of occasions during the three years preceding and including the 2014-15 fiscal year, Leimer advised Anibal Velez, the Executive Director of Operations and Maintenance for the District (and Plaintiff's boss), that she believed, based on the duties Plaintiff actually performed in his position as Supervisor of Buildings and Grounds, that the position was misclassified as managerial confidential and should be a lower paid non-managerial, non-confidential position in the Civil Service Employees Association ("CSEA") bargaining unit. (*See* Velez Aff. ¶ 3.) As part of the budget preparation process for the 2013-14 and 2014-15 fiscal years, the District considered budget proposals that would have eliminated Plaintiff's position, (P's 56.1 Response ¶ 27), but each of those proposals was rejected after Velez advised Leimer that he could not effectively run his department without Plaintiff, (Velez Aff. ¶¶ 4-5).

On or about July 1, 2014, Dr. Roberto Padilla took office as the new Superintendent of Schools for the District. (P's 56.1 Response ¶ 28.) At Board of Education meetings held on April 14 and 16, 2015, the Board approved Padilla's recommendations to abolish twelve non-pedagogical positions for the 2015-16 fiscal year. (*Id.* ¶ 29.) This proposal excluded positions in the District's Operations and Maintenance Division because Padilla, members of his cabinet, and the Board of Education agreed that they had already severely cut the staff of that division when it had abolished six "cleaner positions" for the 2013-14 fiscal year. (*Id.*) The Board ultimately agreed to abolish the following positions: Assistant Superintendent for Inclusive Education, Supervisor of Humanities (grades sixth through eighth), Supervisor of Humanities (grades ninth

4

through twelfth), three home economics teachers, one assistant principal, all of which were pedagogical, and the non-pedagogical positions of one assistant microcomputer technician, five typists, one senior programmer, and one library aide. (Leimer Aff. ¶ 12; *id.* Ex. A.)

Between April 16 and 23, 2015, Padilla advised the members of his cabinet that he believed the District could free up some money to restore some of the soon-to-be abolished positions by abolishing the position of Director of Security and assigning its functions to Velez. (P's 56.1 Response ¶ 30.) He also advised that the District could free up additional money if the District could eliminate Plaintiff's Supervisor of Buildings and Grounds position. (*Id.*) The proposal to eliminate the Supervisor of Buildings and Grounds position had not been raised to Padilla by Leimer, (*id.* ¶ 31), although she had discussed the idea of eliminating Plaintiff's position with Velez in the 2012-13 and 2013-14 fiscal years, (Velez Aff. ¶¶ 4-5), and Padilla was aware that Leimer did not believe the position needed to be a managerial confidential position, (Doc. 63 ("Padilla Aff.") ¶ 7). The parties agree that prior to the commencement of this action, Padilla had never met Plaintiff and that Padilla had no knowledge of Plaintiff's age. (P's 56.1 Response ¶ 32.) The parties also agree that Plaintiff's age was not a consideration in Padilla's decision to recommend the abolition of the position of Supervisor of Buildings and Grounds. (*Id.*)

On or about April 23, 2015, Padilla advised Velez that Padilla was going to recommend to the Board of Education the elimination of the job of Director of Security and that he wanted Velez to help assume the responsibilities of that position. (*Id.* ¶ 33.) Padilla also advised Velez that he was considering recommending to the Board the elimination of the job of Supervisor of Buildings and Grounds and asked Velez if he could manage the Operations and Maintenance

5

Division without Plaintiff. (*Id.* ¶¶ 33-34.) Velez told Padilla he could do so if he got additional help in light of the new security responsibilities. (*Id.* ¶ 34.)

On or about April 23, 2015, Padilla discussed with Leimer the creation of a position to assist Velez, given that he was assuming the duties of the Director of Security. (*Id.* ¶ 37.) Padilla and Velez agreed that the Human Resources department would hold off from disseminating a job description for the new position of Supervisor of Operations and Maintenance until they knew whether Plaintiff would retire or be laid off following the elimination of his position. (*Id.* ¶¶ 37, 39.) The parties agree that if Plaintiff were laid off, he would have had the right under the New York Civil Service Law to appointment off a preferred list to any position the District created which was like the one Plaintiff held prior to his layoff. (*Id.* ¶ 37.) Because in that event he would be entitled to the same salary he had been receiving as Supervisor of Buildings and Grounds, thus negating the savings from and defeating the purposing of abolishing the position, (*id.*),[5] the District determined that if Plaintiff were laid off, the duties of the newly created Supervisor of Operations and Maintenance would be defined in such a way as to make them sufficiently dissimilar from those of the abolished Supervisor of Buildings and Grounds as to preclude Plaintiff from having a right to appointment to the new position at his old salary, (*id.* ¶ 38). Padilla and Leimer agreed that if Plaintiff instead opted for retirement under the District's retirement incentive plan, the Human Resources department could

---

[5] Plaintiff disputes this fact because Plaintiff's replacement was eligible for overtime while Plaintiff was not. (P's 56.1 Response ¶¶ 37-38.) But Velez testified that the Supervisor of Operations and Maintenance would receive overtime pay only if he was performing duties outside his managerial confidential title after his regular working hours. (Urba Aff. Ex. 17 at 77; *see id.* Ex. 10 at 78.) This dispute did not affect the outcome of this motion. Plaintiff has pointed to no evidence that any overtime earned by the Supervisor of Operations and Maintenance would cut significantly into the savings to be generated by the restructuring.

6

assign duties similar to Plaintiff's to the newly created position of Supervisor of Operations and Maintenance. (*Id.* ¶ 39.)

On April 23, 2015, the Board of Education held a special meeting during which Padilla made revised recommendations for the 2015-16 school year. (*See id.* ¶¶ 40-42; Leimer Aff. Ex. A.) Plaintiff attended the meeting. (P's 56.1 Response ¶ 53.) The Board of Education approved, without a formal vote, Padilla's recommendations to eliminate various positions from the 2015-16 budget, including the Director of Security and Plaintiff's position as Supervisor of Buildings and Grounds. (*Id.* ¶ 41; *see id.* ¶ 44.) The Board also approved the creation of the Supervisor of Operations and Maintenance position. (*Id.* ¶ 41.) The District anticipated it would save enough money for the District to restore several positions that had been recommended for elimination, including a home economics teacher, a library aide, and two typists. (*Id.*)[6]

At the April 23 meeting, Padilla told the Board of Education that he was considering recommending that Craig Elmendorf be appointed Supervisor of Operations and Maintenance. (*Id.* ¶ 48.) Padilla was familiar with Elmendorf in his role as President of the local CSEA unit. (*Id.* ¶ 47.) Padilla often met with Elmendorf to discuss issues affecting members of Elmendorf's bargaining unit, and Padilla felt that Elmendorf's relationship with his local CSEA unit's members would benefit Velez. (*Id.*) Padilla did not know Elmendorf's age at the time he recommended him for the position of Supervisor of Operations and Maintenance to the Board, and Elmendorf's age was not a consideration in Padilla's recommendation. (*Id.* ¶ 49.) In April 2015, Elmendorf was fifty years old. (Leimer Aff. Ex. B.) When Padilla told the Board about potentially appointing Elmendorf to the position of Supervisor of Operations and Maintenance,

---

[6] Plaintiff disputes this fact because Plaintiff's replacement was eligible for overtime while Plaintiff was not. (P's 56.1 Response ¶ 41.) For reasons discussed in footnote 4, this dispute did not affect the outcome of this motion.

he also advised them that it was his intention that the new position would not be classified as managerial confidential. (P's 56.1 Response ¶ 51.) Various members of the Board expressed a concern about the effective second in command to Velez serving as the President of the local CSEA unit, the members of which would be under Velez's supervision and subject to Velez's evaluations of their performance. (Padilla Aff. ¶ 12.) As a result, Padilla recommended to the Board that the Supervisor of Operations and Management position be classified as managerial confidential, so that if Elmendorf accepted the position, he could not continue to be in the CSEA bargaining unit and would have to resign as president. (*Id.*)

Between April 23 and May 1, 2015, Plaintiff had multiple conversations with Velez during which Velez advised Plaintiff that he needed to retire if he wanted to retain his District-funded lifetime health benefits. (P's 56.1 Response ¶ 54.) Plaintiff testified that because his wife has diabetes and her medicines and treatment cost thousands of dollars, Plaintiff could not afford to lose his District-funded lifetime retiree health benefits. (*Id.* ¶ 55.) Plaintiff understood that if he did not retire upon the abolition of his position, he would be laid off and would lose his District-funded benefits. (*Id.* ¶ 56.) Plaintiff also understood that he would be on a preferred list for a potential future appointment. (*Id.*)

On May 1, 2015, Plaintiff attended a meeting "with District representatives other than Leimer." (*Id.* ¶ 59.) Plaintiff was told at the outset of the meeting that if he did not submit his retirement application, he would lose his District-paid health insurance upon the abolition of his position. (*Id.*) Plaintiff does not allege that this advice was incorrect or that he had any option other than retiring with health benefits or being laid off without them and remaining eligible for rehire. Plaintiff brought to the meeting a typed letter stating his intent to retire effective June 30, 2015. (*Id.*; Leimer Aff. Ex. E.) The letter bears Leimer's initials and handwritten receipt date

8

("5/1/15"), as well as handwritten Human Resources department calculations as to the payments Plaintiff would receive upon retirement. (Leimer Aff. Ex. E; Leimer Aff. ¶ 21.) The letter stated that Plaintiff was "writing a letter of intent for purposes of retirement to receive benefits from the NYS Employees Retirement System effective June 30, 2015," that he was seeking eligibility for benefits under the District's "retirement incentive plan," and that it had been his "pleasure working for the [District] and [he] greatly enjoyed [his] years working with Andy Velez." (Leimer Aff. Ex. E.) Plaintiff further noted that as a retiree, he would be eligible for health insurance coverage at no cost to him, as well as reimbursement of his sick day balance as of June 30, 2015. (*Id.*) He also requested a service payment of $500 per year for each of his thirteen years as a confidential managerial employee and that the District waive the four-month written notice requirement for Plaintiff to be eligible for a District retirement incentive of 20% of his final year's salary. (*Id.*)

Plaintiff's retirement was approved by the District's Board of Education at its regular meeting on May 12, 2015. (P's 56.1 Response ¶ 62.) At the meeting, Plaintiff asked if he could return to his carpenter position and was told that there were no positions being offered to him at that time. (*Id.* ¶ 63.) By retiring rather than being laid off upon the abolition of his position, Plaintiff secured lifetime health benefits at the District's cost for himself and his spouse. (*Id.* ¶ 66.) As part of his retirement incentive package, Plaintiff also received $7,500 as a retirement incentive payment and a $6,500 service payment. (*Id.*) Plaintiff does not believe that he was qualified for the position of Supervisor of Operations and Maintenance because he lacked the requisite two years of experience supervising and evaluating maintenance or custodian staff. (*Id.* ¶ 65.)

On May 26, 2015, the Board of Education held a regular meeting during which it formally voted to abolish the Supervisor of Buildings and Grounds and Director of Security positions, along with five other non-pedagogical positions, effective on June 30, 2015. (*Id.* ¶ 44.) During this meeting the Board also voted to abolish nine pedagogical positions. (*Id.* ¶¶ 44-45.) The ages of the employees whose positions were eliminated ranged from thirty-two to sixty-six. (Leimer Aff. ¶ 27.)

### B. Procedural History

On June 29, 2016, Plaintiff initiated this action. (Doc. 1.) He filed an Amended Complaint on October 6, 2016. (Doc. 18.) On August 31, 2017, the Court granted Defendants' motion to dismiss in part, dismissing multiple defendants and claims, leaving a single claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, against the District. (Minute Entry dated Aug. 31, 2017.) Plaintiff filed a Third Amended Complaint on September 27, 2017, (Doc. 39), and on February 13, 2018, the Court denied Plaintiff's motion to amend that complaint, (Minute Entry dated Feb. 13, 2018).

On April 9, 2018, the Defendant filed a letter requesting a pre-motion conference in anticipation of its motion for summary judgment. (Doc. 54.) Plaintiff responded on April 25, 2018, (Doc. 56), and a pre-motion conference was held on May 9, 2018, (Minute Entry dated May 9, 2018). On August 28, 2018, the parties filed their motion papers in connection with the instant motion. (Docs. 59-68; 70-73.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the

motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Id.* 56(e)(2), (3).

## III. DISCUSSION

### A. Legal Standard

In this Circuit, ADEA claims are assessed under the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *E.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). At the *prima facie* stage, the burden of proof is minimal. *See id*. A plaintiff must show "(1) that [he] was within the protected age group, (2) that [he] was qualified for the position, (3) that [he] experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107.

Once a *prima facie* case is established, "a rebuttable presumption of discrimination arises" and the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis and alteration in original) (internal quotation marks omitted).

Once the defendant proffers a legitimate, non-discriminatory reason for the challenged employment action, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination.

12

*See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 93 (2d Cir. 2001). To satisfy that burden, the plaintiff in an ADEA case must "show that the employer's determination was in fact the result of discrimination;" more specifically, he "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Gorzynski*, 596 F.3d at 106 (internal quotation marks omitted) (citing *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 180 (2009)).

B. **Application**

The Court need not decide whether Plaintiff has established a *prima facie* case of age discrimination because, even if he has, his ADEA claim fails at the third step of the *McDonnell Douglas* analysis. *See Downey v. Adloox Inc.*, No. 16-CV-1689, 2018 WL 5266875, at *5 (S.D.N.Y. Oct. 23, 2018) (skipping first step of *McDonnell Douglas* where Defendant satisfied second step and Plaintiff failed to satisfy third step). The Defendant has plainly articulated "a legitimate, nondiscriminatory business rationale for its actions." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Defendant explained that it eliminated Plaintiff's position "as part of a reorganization and reduction of its staffing in order to save money for retaining other needed staff positions during the annual budget process." (Doc. 65 at 16-17.) "A reduction in workforce and/or restructuring is a legitimate, non-discriminatory reason," *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 277 n.19 (S.D.N.Y. 2011) (collecting cases), *aff'd*, 470 F. App'x 20 (2d Cir. 2012) (summary order), and "[t]he [ADEA] does not forbid essential corporate belt-tightening having no discriminatory motivation," *Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 548 (E.D.N.Y. 2014) (internal quotation marks omitted).

Therefore, to survive summary judgment, Plaintiff is required to demonstrate that a reasonable jury could find that the reason articulated by the District was pretextual and that age was the "but-for" cause of the decision to eliminate Plaintiff's position. Plaintiff has failed to do so. Padilla recommended to the District Board of Education the elimination of several pedagogical and non-pedagogical positions in the District, one of which was Plaintiff's. This recommendation was part of a larger process to save money that could be allocated to restoring other positions that had previously been voted upon for elimination in the 2015-16 fiscal year. The persons whose positions were abolished ranged from thirty-two to sixty-six years of age. (Leimer Aff. ¶¶ 27-28.) Plaintiff has provided no evidence that this restructuring did not or was not intended to accomplish its stated goal.

Most importantly, Padilla, who made the decision to eliminate Plaintiff's position, had never met Plaintiff and had no idea how old Plaintiff was. "[D]iscriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005). Thus, a plaintiff relying on an age discrepancy must adduce some evidence of the decision-maker's knowledge of the relative ages of the parties compared. *Id.* at 83. Plaintiff has produced no such evidence. *See Coward v. Town & Village of Harrison*, 665 F. Supp. 2d 281, 305 (S.D.N.Y. 2009) (granting summary judgment in favor of defendant on § 1983 claim where there was no evidence decision-maker knew plaintiff's race); *McDowell v. T-Mobile USA, Inc.*, No. 04-CV-2909, 2007 WL 2816194, at *3 (E.D.N.Y. Sept. 26, 2007), (granting summary judgment in favor of defendant where "critical decision-maker" unaware of plaintiff's protected characteristic), *aff'd*, 307 F. App'x 531 (2d Cir. 2009) (summary order); *Garner v. Bally Total Fitness Corp.*, No. 03-CV-9617, 2006 WL 2871971, at *3 (S.D.N.Y. Oct. 10, 2006) (granting employer summary judgment where no

evidence that person who made decision to suspend plaintiff knew of his age or race). No reasonable factfinder could conclude, by a preponderance of the evidence, that age was the "but-for" cause of Plaintiff's allegedly forced retirement.[7] *See Gorzynski*, 596 F.3d at 106.

Plaintiff points to several comments made by District employees as evidence of the District's discriminatory intent. (P's Opp. at 1, 19.) For example, Plaintiff testified at his deposition that at some point,[8] Leimer said, "I hear you might be retiring soon," (Rushfield Affirm. Ex. A at 72:12-73:2, 76:6-77:5), and that around Plaintiff's sixtieth birthday, Velez asked Plaintiff when he planned to retire, (*id.* 55:19-56:17). Plaintiff further testified that shortly thereafter, Velez asked Plaintiff about his age "many" times. (*See id.* at 59-63.) Those comments, however, are insufficient to create a triable issue of fact on the question of discrimination. Remarks may raise an inference of discrimination if "a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004). In determining whether a comment is probative of an employer's discriminatory intent, courts in this circuit consider

---

[7] Plaintiff alleges that the adverse action he suffered was a constructive discharge. (P's Opp. at 10-11.) A constructive discharge occurs "when [an] employer, rather than discharging [the employee] directly, intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003). Plaintiff points to a few comments his co-workers made regarding his age and retirement, which hardly rise to the level of an "intolerable" work atmosphere. While elimination of one's position is an adverse employment action, *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009), *superseded by regulation on other grounds as stated in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013), and Defendant does not argue otherwise, the choice Plaintiff faced upon that action does not amount to a separate adverse action. Faced with the difficult decision between receiving District-funded lifetime health benefits by retiring or losing those health benefits by awaiting a layoff, Plaintiff made a voluntary and strategic decision for himself and his family.

[8] Plaintiff asserts that Leimer made this comment to him in January 2015. (P's Opp. at 1.) The exhibit pages to which Plaintiff cites in support of that proposition do not state the date of Leimer's comment.

> (1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark . . . ; and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Here, there was no nexus between the remarks of the District's employees and Padilla's decision to eliminate Plaintiff's position. "[D]iscussion of retirement is common in offices, even between supervisors and employees, and is typically unrelated to age discrimination," and "even direct references to a plaintiff's age are not necessarily indicative of discrimination." *Hamilton v. Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007), *aff'd*, 331 F. App'x 874 (2d Cir. 2009). In fact, Plaintiff testified that the first time Velez asked about his age, the two of them were at a bar playing pool. (Rushfield Affirm. Ex. A at 62:8-16.) Plaintiff further characterized his conversations with Velez about his age and retirement plans – which included discussion about Velez's own plans and those of another co-worker – as "just friends talking." (P's 56.1 Response ¶ 20; *see id.* ¶ 21.) He points to no comments by anyone – let alone Padilla, who made the decision – suggestive of hostility toward older people. Without any indicia of animus in the record, a jury could not find that a few ordinary comments among colleagues rise to the level of discriminatory intent, or that those comments – unknown to the decision-maker – had any influence on the challenged decision.

Plaintiff argues that the sudden increase in the number of failure-to-call notices he received in the months around his sixtieth birthday indicates discriminatory intent. But that argument is also unavailing. Two District employees stated that all employees of the District were subject to the call-in requirement and that confidential managerial employees were not exempt. (Leimer Aff. ¶ 3; Velez Aff. ¶ 2.) But even if Plaintiff has raised an issue of fact about whether he was subject to the call-in requirement, he has not provided evidence suggesting that

the notices for failure to call in to the tape system had anything to do with his age or that his ostensibly forced retirement had anything to do with the notices. Plaintiff does not even allege that the notices were without basis, but in any event, there would have been no need for the District to manufacture unjustified failure-to-call notices, because there is nothing in the record to suggest that the District had to cite to work misconduct to abolish Plaintiff's position. Any connection between the notices and Plaintiff's age is far too attenuated for a reasonable juror to conclude that Plaintiff's age was the but-for cause of the elimination of his position.

Plaintiff further argues that the District's discriminatory intent is reflected by the fact that the position the District created following Plaintiff's retirement closely resembled the position that Plaintiff held. (P's Opp. at 19.) But Plaintiff cannot avoid the fact that the District had a valid, non-discriminatory reason for eliminating the Supervisor of Buildings and Grounds position and creating the similar Supervisor of Operations and Maintenance position: saving money. The District saved money by eliminating the Director of Security position and giving its responsibilities to Velez, and by eliminating Plaintiff's position. Because Velez indicated he would need help to handle his added responsibilities without Plaintiff, the Supervisor of Operations and Maintenance position was created but at a lower rate of pay.[9] The District thus consolidated three positions (Velez's, Plaintiff's, and the Director of Security position) into two (Velez's and the Supervisor of Operations and Maintenance position).[10] The savings enabled the

---

[9] The District's summary of 2015-16 budget changes indicated that elimination of Plaintiff's position would save $132,234; elimination of the Director of Security position would save $80,907; and creation of the Supervisor of Operations and Maintenance position would cost $105,430. (Leimer Aff. Ex. D.)

[10] The fact that that position was filled with someone ten years younger than Plaintiff does not suffice to show pretext on a summary judgment motion. *Nathe v. Weight Watchers Int'l, Inc.*, No. 06-CV-4154, 2010 WL 3000175, at *5 (S.D.N.Y. July 26, 2010).

District to avoid eliminating other positions, including pedagogical positions, previously earmarked for abolition. Likewise, the District had a non-discriminatory reason for holding off on establishing requirements for the Supervisor of Operations and Maintenance position until Plaintiff decided whether to retire or accept a layoff. Had he decided to take the layoff, the District would have created a position sufficiently different so that Plaintiff could not take it as of right at his old salary and thereby defeat the cost-saving purpose of the change. Because he decided to retire, the District had the option to create a similar position and pay less for it. While this machination might seem unfair, there is not a shred of evidence that it was motivated by anything other than savings or that it had anything to do with Plaintiff's age.[11]

Finally, Plaintiff suggests he was targeted based on age because his name appeared on a CSEA Retirees list dated March 28, 2015, three days after Leimer suspended Plaintiff. (P's Opp. at 12.) Barbara Watt, a member of the District's Human Resources department, was responsible for keeping track of civil service employees and confidential managerial employees who were going to retire. (Doc. 62 ¶¶ 1-2.) Watt named the list "CSEA RETIREES," even though she includes confidential managerial employees on the list, because the majority of retirees she tracks are CSEA members. (*Id.* ¶ 3.) Before receiving Plaintiff's retirement letter, Watt placed "as of 3/28/15" on the "CSEA RETIREES" list to reflect the date she had updated or reviewed that list. (*Id.* ¶ 4.) Watt added Plaintiff to the list after receiving Plaintiff's May 1, 2015 retirement letter, but she neglected to change the "as of" date as she added his name and those of

---

[11] Plaintiff also argues that the District's failure to provide his full personnel file in response to a Freedom of Information Law request shows the District was trying to cover up its discriminatory intent. (P's Opp. at 22.) This argument does not bear the weight Plaintiff assigns it. There may be any number of reasons for this failing. In any event, none of the documents Plaintiff describes as missing relate in any way to Plaintiff's age.

18

other retirees whose retirements were accepted by the Board at its May 12, 2015 meeting. (*Id.* ¶¶ 4-7.) In other words, Plaintiff was not on the list as of March 28, 2015, or at any time before he put in his retirement letter. (*Id.*) But a copy of the list with Plaintiff's name and the "as of 3/28/15" remark was placed in Plaintiff's personnel file, (*id.* ¶ 6), leading him to suspect that he was targeted. Plaintiff presents no evidence, however, to undermine Watt's account that the date on the list is a simple mistake or to otherwise suggest that his allegedly premature appearance on the list was the responsibility of anyone who bore discriminatory animus. Further, even if Watt had placed Plaintiff's name on this list before he had submitted a letter of retirement, there is no indication that his presence on the list had any bearing on Padilla's recommendation to abolish his position or the Board of Education's decision to do so. Accordingly, Plaintiff's name appearing on the CSEA Retirees list does not evidence discriminatory intent behind the adverse action.[12]

Plaintiff's arguments, considered together and in their totality, do nothing to undermine Defendant's evidence that its decision to abolish Plaintiff's position – leaving him with the choice to retire or accept a layoff – was based on a desire to save money. No rational jury could conclude that Plaintiff's age was a but-for cause of his predicament. There is thus no genuine issue of material fact for trial.

---

[12] Plaintiff's argument in this regard highlights a problem with his entire theory. He notes that March 28, 2015 is three days after he was suspended, and – based on his belief that his name appeared on the list at that time, and not after he decided to retire as the evidence shows – he suggests that he was targeted for forced retirement based on the unjustified accusation underlying the suspension. (P's Opp. at 12-13.) Elsewhere he argues that he was forced out as retaliation for his request that Leimer amend her letter ending the suspension, (*see* P's 56.1 Response ¶ 67), or because the District wanted to put Elmendorf in his position because Elmendorf had been a troublemaker as union president, (*id.* ¶ 68). These things may or may not be true, but assuming they are, they have nothing to do with age and thus undermine any argument that age was a but-for cause of the elimination of his position.

19

## IV. <u>CONCLUSION</u>

For the reasons discussed above, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 59), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: February 6, 2019
       White Plains, New York

                                                    CATHY SEIBEL, U.S.D.J.